UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

LENYA M. OROZCO,

               Plaintiff,

     v.

COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

             Defendant.

Civil No. 6:13-cv-00400-ST

OPINION AND ORDER

STEWART, Magistrate Judge:

## INTRODUCTION

Plaintiff, Lenya Orozco, ("Orozco"), seeks judicial review of the final decision by the Social Security Commissioner ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("SSA"), 42 USC §§ 401-433, and Supplemental Security Income ("SSI") under Title XVI of the SSA, 42 USC §§ 1381-1383f. This court has jurisdiction to review the Commissioner's decision pursuant to 42 USC § 405(g) and § 1383(c)(3). All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c). For the

reasons set forth below, the Commissioner's decision is reversed and remanded for an immediate award of benefits.

## ADMINISTRATIVE HISTORY

Orozco protectively filed for DIB and SSI on September 16, 2009, alleging a disability onset date of March 24, 2008.  Tr. 215-21.[1]  Her applications were denied initially and on reconsideration and she requested a hearing.  Tr. 133-38, 157-64, 168-76.  On February 17, 2012, Administrative Law Judge ("ALJ") James Yellowtail conducted a hearing.  Tr. 87-132.  Orozco, her husband, Raul David Orozco Fuentes ("Fuentes"), and a Vocational Expert ("VE") testified. Tr. 87.  The ALJ issued a decision on March 8, 2012, finding Orozco not disabled.  Tr. 10-31. The Appeals Council denied a request for review on January 24, 2013.  Tr. 1-9.  Therefore, the ALJ's decision is the Commissioner's final decision subject to review by this court.  20 CFR §§ 404.981, 416.1481.

## BACKGROUND

Born in 1973, Orozco was 39 years old at the time of the hearing before the ALJ.  Tr. 94. She graduated from high school, has some college education, and has worked as a human resources clerk, stock clerk, garment sorter, and pricer.  Tr. 94-95, 124-126, 268-79.  Orozco alleges that she became unable to work on March 24, 2008, due to the combined impairments of epilepsy, a cognitive disorder, major depressive disorder, and a general anxiety disorder.  Tr. 237-38.

///

///

I.    **Medical Records**

On October 30, 2007, Orozco began seeing Physician Assistant ("PA") JoDee R.

Rundall.  Tr. 478.  Orozco related a history of seizures from birth and a history of anxiety and

depression in her 20's, but was not having problems with depression or anxiety since becoming

clean and sober in 1999.  *Id*.  PA Rundall prescribed Dilantin and referred Orozco to neurologist

Sydney Piercey, MD.  Tr. 480.

On January 15, 2008, Orozco reported worsening depression to PA Rundall, but no

seizures since the October 2007 visit.  Tr. 476.  PA Rundall prescribed Celexa.  Tr. 477.

On February 12, 2008, Dr. Piercey examined Orozco.  Tr. 381.  Orozco reported she

began having seizures in early childhood and never had full control of them.  *Id*.  She reported

two generalized seizures[2] in the past year while at work, one in July and the other in September

2007, and about one generalized seizure a month at home.  *Id*.  Orozco complained of difficulty

with short-term memory and "assimilating new memory."  *Id*.  Dr. Piercey noted Orozco was

mildly distracted.  Tr. 382.  She recommended slowly removing Orozco from Dilantin and

prescribed Topamax instead.  Tr. 383.

Orozco saw Dr. Piercey again on April 10, 2008.  Tr. 374.  In the interim, Orozco had

been in telephone contact with Dr. Piercey and reported agitation with the Topamax and

---

[1] Citations are to the page(s) indicated in the official transcript of the record filed on August 8, 2013 (docket #11).

[2] Orozco experienced a variety of seizure types – namely generalized, partial, and petit mal.  The record refers to all types with alternative names.  A generalized seizure (also named tonic-clonic or grand mal seizure) is one type of seizure that involves the entire body.  MEDLINEPLUS, http://www.nlm.nih.gov/medlineplus/ency/article/003200.htm (last visited July 18, 2014).  A focal seizure (also named partial seizure), unlike generalized seizures, happens in just one part of the brain.  *Id* at http://www.nlm.nih.gov/medlineplus/seizures.html (last visited July 18, 2014).  A petit mal seizure (also named absence seizure) is the term given to a staring spell.  *Id* at http://www.nlm.nih.gov/medlineplus/ency/article/000696.htm (last visited July, 18, 2014).

continuing seizures. *Id*. Dr. Piercey discontinued the Topamax and started Keppra and Zonegram. *Id*. By the April 10 appointment, Orozco stated she had not suffered a seizure in the last 20 days. *Id*. Orozco's electroencephalogram ("EEG") was abnormal with an epileptogenic focus most prominent in the left temporal region. *Id*.

On April 28, 2008, Orozco saw PA Rundall, and reported "a lot of confusion and fatigue" because of seizures that were affecting her work. Tr. 472. Orozco reported two generalized seizures in the past two months and partial seizures daily. *Id*. She had missed four days of work because of the seizures. *Id*. Her depression and anxiety were improved after Dr. Piercey had increased her Celexa dosage a month prior. *Id*. PA Rundall continued Orozco's prescriptions and recommended a follow-up with Dr. Piercey. Tr. 473.

Orozco saw Dr. Piercey the next day. Tr. 372. Orozco had not suffered any further generalized seizures, but was having partial seizures, was fatigued and confused, had lost weight, and had no appetite. *Id*. Dr. Piercey adjusted her medications. Tr. 372-73.

On May 7, 2008, Orozco reported to Dr. Piercey no generalized seizures since the prior visit, but had suffered a few partial seizures which she described as a sensation that her eyes are moving. Tr. 370. She continued to have some fatigue and confusion, but had improved in the past week. *Id*. She was able to continue working at reduced hours. *Id*.

On June 4, 2008, Orozco reported to Dr. Piercey that she suffered a tonic-clonic seizure on May 14 and continued to have partial seizures daily which occurred when she concentrated. Tr. 388. Orozco was unable to work any longer because of the seizures and requested a six-week medical leave of absence. *Id*. Dr. Piercey noted her mood was depressed and tearful, primarily because of the seizures. *Id*. An ambulatory EEG on May 29, 2008, was abnormal, showing

activity "typically seen in a patient with a history of idiopathic generalized epilepsy." Tr. 402-03. Orozco had reported to Dr. Piercey that she suffered two of her typical simple seizure events during the ambulatory EEG, and the EEG recorded events that "did at least partially correlate with the clinical events of feeling shaky and 'feeling partial seizures.'" Tr. 388, 403.

On June 20, 2008, at Dr. Piercey's request, otolaryngologist Nick C. Benton, MD, examined Orozco and discussed the implantation of a vagus nerve stimulator. Tr. 378. He advised that the stimulator could be quite helpful to control seizures and potentially reduce the need for medications. Tr. 379. On July 1, 2008, Dr. Benton surgically implanted the stimulator. Tr. 357.

On July 11, 2008, before the stimulator was activated, Orozco reported a recent generalized seizure to Dr. Piercey. Tr. 363. At that appointment, Dr. Piercey activated the stimulator. *Id*. On July 28, 2008, Orozco reported another generalized seizure, and Dr. Piercey adjusted the stimulator. Tr. 365.

On August 11, 2008, Orozco reported having a generalized seizure on August 1, 2008, and continued partial seizures, though less frequently. Tr. 376. She felt using a magnet helped with the partial seizures. *Id*. Dr. Piercey again adjusted the stimulator. Tr. 377.

Orozco next saw Dr. Piercey five months later on January 19, 2009, and reported no new generalized seizures since August 1, 2008. Tr. 386. She continued to have auras, but nothing to suggest a partial seizure with alteration of consciousness or loss of motor control. *Id*. She was enrolled in Linn Benton Community College and school was going well. Tr. 387.

Six months later, on July 10, 2009, Orozco saw PA Rundall for complaints of anxiety and insomnia. Tr. 462. She was experiencing stressors at home as her three-year-old son had been diagnosed with Type I Diabetes. *Id*.

At a follow-up examination on August 26, 2009, by Dr. Piercey, Orozco reported no generalized seizures since August 2008. Tr. 390. However, she was depressed and had panic attacks about three times a month. Tr. 392. Dr. Piercey prescribed Prozac and tapering off Celexa. Tr. 396.

On October 9, 2009, Orozco sought treatment at urgent care for nausea and reported two seizures in the preceding week. Tr. 454. On October 16, 2009, Orozco reported to Dr. Piercey that the Prozac had helped her depression, but that she had five seizures in the past couple of weeks which were interfering with her school. Tr. 523. Dr. Piercey reprogrammed her stimulator. Tr. 524. He discontinued Prozac which "most likely" had caused the seizures. Tr. 523-24. Dr. Piercey noted Orozco was applying for social security disability which she felt was "reasonable given the frequency and intensity of her refractory epilepsy." Tr. 524.

On October 11, 2009, Dr. Piercey wrote a letter stating that Orozco suffered from refractory (treatment resistant) epilepsy, released her to return to work or school on October 19, and asked that she be excused for all absences October 11-16. Tr. 517. She restricted Orozco from using heavy machinery or ladders and attendance at work or school when she had had a seizure in the past 24 hours or was having moderate to severe side effects from medication. *Id*. If her employer could not provide work within these restrictions, Dr. Piercey authorized temporary disability. *Id*. She expected these restrictions to be permanent. *Id*.

On October 30, 2009, Orozco reported one generalized tonic-clonic seizure since October 11.  Tr. 521.  Orozco reported that even one seizure was quite disruptive, especially with fatigue and confusion.  *Id*.  Dr. Piercey adjusted the stimulator and prescribed Neurontin.  *Id*.

On December 22, 2009, Orozco reported to Dr. Piercey that she had no seizures in November, but had two in December.  Tr. 611.  She said it seemed the Neurontin had helped, but that when she ran out and could not afford to refill the prescription, she suffered a seizure the next day.  *Id*.

On January 27, 2010, psychologist J. Mark Wagener, PhD, examined Orozco at the request of the agency.  Tr. 557.  Orozco reported that due to her seizures she was on medical leave from her job and had dropped out of classes at the community college.  *Id*.  She stated that the seizures made her depressed and that the "medications have a lot of side effects."  *Id*.  She reporting having nine seizures in October and two in November and that the medication and vagus nerve implant did not control the seizures.  *Id*.  She also told him she had scarring on her brain and that her memory was affected.  *Id*.

Dr. Wagener noted Orozco's short- and long-term memory appeared to be intact.  Tr. 559.  Her ability to maintain concentration was fair.  *Id*.  Her ability to vocalize abstractions was poor and her response latencies were slow.  *Id*.  Her mood was mildly depressed; she did not appear to be exaggerating symptoms; and the information provided appeared consistent with observed behavior.  *Id*.  Testing revealed an average range of intellectual functioning, with a statistically significant difference between Verbal IQ and Performance IQ.  *Id*.  Orozco's working memory was statistically significantly lower than both verbal comprehension and perceptual organization.  *Id*.  Her performance on the Trail Making test was slow and suggestive

of abnormal brain functioning.  Tr. 560.  Dr. Wagener diagnosed Orozco with Major Depressive

Disorder and Cognitive Disorder NOS.  *Id.*  He opined that Orozco's "ability to sustain

concentration and maintain attention and to persist at tasks would be significantly impaired by

depressive symptoms."  *Id.*

    On March 8, 2010, Dr. Piercey again examined Orozco.  Tr. 613.  Orozco reported no

seizures in January, but one on February 4 and another on March 6.  *Id.*  She had "much

depression" with the seizure in February and some suicidal thoughts.  *Id.*  She stated she was

compliant with medication and not suffering side effects from the Neurontin and Zonegram.  *Id.*

Dr. Piercey noted increased depressive symptoms and referred Orozco for psychiatric treatment.

Tr. 614.

    On March 11, 2010, psychologist Joyce Fusek, PsyD, examined Orozco.  Tr. 600.

Orozco reported suffering from depression most of her life which had become more prominent in

the prior several months.  *Id.*  She had to drop out of school because she could not concentrate

and had a lot of anxiety and depression around her son's illness.  *Id.*  Despite the Celexa

prescribed by Dr. Piercey, Orozco indicated she "is continuing to feel depressed including some

suicidal thinking, low mood, difficulty coping, feeling overwhelmed, suicidal ideation although

no intent and poor functioning in general."  *Id.*

    Dr. Fusek conducted a personality inventory which indicated "at least a moderate level of

pathology" characterizing Orozco's overall personality organization.  Tr. 602.  Orozco's

"foundation for effective intrapsychic regulation and socially acceptable interpersonal conduct

appeared sufficient or incompetent."  *Id.*  Her profile suggested a "pervasive apprehensiveness,

intense and variable moods, prolonged periods of dejection and self-deprecation, and periods of

withdrawal, isolation, and unpredictable anger." *Id*. Dr. Fusek noted the test results were valid

and suggested that Orozco answered in an honest manner. Tr. 601. Dr. Fusek diagnosed Major

Depression (recurrent, severe without psychotic features); Generalized Anxiety Disorder;

Psychoactive substance abuse, NOS; and Depressive Personality Disorder, with borderline and

dependent traits. Tr. 604. Dr. Fusek opined that the test strongly suggested a great deal of

clinical depression, anxiety, and that Orozco would need weekly, long-term treatment, and

psychiatric management of medication to stabilize her symptoms. *Id*.

During a March 30, 2010 psychotherapy session, Orozco reported continuing to feel

fairly overwhelmed, having a hard time getting out of bed, being very depressed, and unable to

do a lot other than watch her son at which she failed at times by falling asleep. Tr. 596.

Dr. Fusek noted that Orozco appeared anxious. *Id*. At her April 16, 2010 session, Orozco's

mental status was still anxious, and Dr. Fusek worked with her on coping strategies. Tr. 595.

On April 13, 2010, PA Rundall examined Orozco for complaints of left arm pain and

popping of her left shoulder. Tr. 675. Orozco reported "bad depression with anxiety attacks"

three times a week. *Id*. Her last grand mal seizure was in March, but she continued to

experience little partial seizures every three days. *Id*. PA Rundall noted deteriorated and

worsening depression/anxiety and recommended psychiatric treatment. Tr. 677.

On April 26, 2010, Orozco reported to Dr. Piercey she was still having about one

generalized seizure a month, and "little seizures" without alteration of consciousness or loss of

motor control. Tr. 615. She was compliant with medication, but stated that she would be losing

her insurance coverage in a few days. *Id*. Dr. Piercey prescribed a trial of Vimpat. Tr. 616.

On June 23, 2010, Orozco reported no generalized seizures since her last visit.  Tr. 631. Her mood was improved which she attributed to better seizure control.  *Id*.  The Vimpat helped, but with some side effect of myoclonus (shocklike contractions of a group of muscles).  Tr. 632.

On October 22, 2010, Orozco sought emergency treatment for anxiety, stating she could not calm down.  Tr. 661.  She appeared anxious and was given medication and instructions to follow up in a few days.  *Id*.

On December 22, 2010, Orozco saw PA Rundall for anxiety.  Tr. 671.  Orozco reported she had a panic attack with anger in October and threw a lamp at her husband.  *Id*.  She also reported she had just qualified for insurance through the Oregon Health Plan and needed mental health services, but was unsure how to access them.  *Id*.  PA Rundall noted Orozco had a flat affect and was easily distracted, though she was not hyperactive or anxious.  Tr. 673.  She referred Orozco to Linn County Mental Health ("LCMH") for counseling.  *Id*.

On December 28, 2010, Orozco was assessed at LCMH by David Bauer, LMFT. Tr. 658.  Orozco was seeking to increase her emotional regulation, stress management, and confidence.  *Id*.  She reported ongoing thoughts of suicide, but denied plan or intent, and feelings of being depressed, irritable, and anxious on a daily basis.  *Id*.  Bauer diagnosed Adjustment Disorder with mixed anxiety and depression and Post-Traumatic Stress Disorder ("PTSD"), with a GAF[3] of 38.  Tr. 659.

---

[3] The Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) organizes each psychiatric diagnosis into five levels relating to different aspects of the disorder or disability. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 27-33 (4th ed., text rev., 2000).  Axis V is the Global Assessment of Functioning (the "GAF"), which reports the clinician's judgment of the individual's overall functioning.  *Id* at 32-33.  A GAF score of 31-40 indicates: "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."

On July 4, 2011, Orozco was examined at urgent care by Daniel D. Mulkey, MD, for left shoulder pain.  Tr. 668.  She had injured her shoulder when she had a seizure on June 30, 2011. Tr. 670.

On July 19, 2011, orthopedic surgeon Rick Stanley, MD, examined Orozco and diagnosed probable recurrent dislocations of the left shoulder with more of a soft tissue injury, from seizures.  Tr. 651.  Dr. Stanley noted that x-rays showed some lesions indicating previous dislocations.  Tr. 652.  He opined that Orozco probably needed a surgical procedure to stabilize the shoulder, but this was not feasible as long as her seizures were not controlled because of the probability of re-injury.  Tr. 651.

On August 10, 2011, Orozco reported to Dr. Piercey that she had two seizures in June and two in July.  Tr. 694.  She had been out of Vimpat for a couple of months, correlating to the increase in seizures.  *Id*.  Dr. Piercey provided Vimpat for Orozco to re-start, and asked her to keep a calendar of seizure events and medication errors.  Tr. 695.

On August 26, 2011, Dr. Piercey wrote a letter stating that full-time employment was "not a reasonable consideration" for Orozco.  Tr. 689.  He wrote that "[d]espite aggressive medication trials and an implanted vagal nerve stimulator she was experiencing greater than 1 grand mal seizure a month and on average 2" and "several partial seizures in addition per month."  *Id*.  He also opined that assimilation of new information on a new job may be "problematic from a neurocognitive standpoint."  *Id*.

On October 11, 2011, Orozco told Dr. Piercey she was taking the Vimpat and had not had any generalized seizures, but had "little seizures" every time she concentrated or stared at something which felt like auras.  Tr. 692.  It was unclear to Dr. Piercey whether these events

were side effects of medication or were partial seizures.  *Id*.  He wanted neurocognitive testing, but insurance was a barrier.  *Id*.  Another EEG on October 31, 2011, was abnormal, consistent with a history of epilepsy.  Tr. 690.

On November 7, 2011, Orozco reported to PA Rundall that she was unusually tired and fatigued, but did not feel depressed or sad.  Tr. 722.  PA Rundall recommended exercise and a follow-up in one month.  Tr. 723.  On December 7, 2011, Orozco again reported to PA Rundall that she was tired and fatigued.  Tr. 719.  He referred Orozco to a sleep lab for suspected sleep apnea.  Tr. 721.

On January 1, 2012, Orozco reported to therapist Bauer that she had increased irritability, impulsivity, aggression, and decreased judgment.  Tr. 699.  Bauer noted that Orozco was "restless/hyperactive/fidgety" and "agitated/intense."  Tr. 700.  In most of his contact with her, Orozco appeared cooperative, but she reported feeling overwhelmed, agitated, hostile, and aggressive in public and at home.  *Id*.  Orozco's affect appeared blunted and constricted, and she appeared moderately depressed and tired.  *Id*.

When Orozco next saw Bauer on January 30, 2012, she reported that she was more engaged in daily housekeeping and in activities with her family, but still had ongoing anxiety, irritability, and emotional dysregulation.  Tr. 697.  Bauer noted Orozco's symptoms posed a challenge "to effectively functioning in an employment setting, with interacting with the public and handling conflict or criticism."  *Id*.  She appeared "capable of performing moderately detailed tasks and instructions," but was "unable to effectively handle anything close to full time employment eight hours/day or working 5 days/week."  *Id*.  Despite progress, Orozco appeared to be challenged with the limitations she initially presented at intake.  *Id*.

On February 8, 2012, Orozco reported pain in her left shoulder after suffering a seizure on January 31, 2012.  Tr. 715.

On February 14, 2012, Orozco reported to Dr. Piercey continued "breakthrough" seizures.  Tr. 740.  Dr. Piercey diagnosed Orozco with "Epilepsy, unspecified" and noted "[b]reakthru [sic] events now despite addition of VIMPAT.  Further evaluation is needed to optimize control."  *Id*.

## II.    Testimony

### A.    Orozco's Testimony

Orozco testified at the hearing on February 17, 2012, that she suffers both grand mal and petit mal seizures.  Tr. 97.  She had one grand mal seizure in the three months preceding the hearing and has petit mal seizures regularly, whenever she concentrates, such as when reading, writing, or anything requiring her focus.  Tr. 98-99.  It takes her a few hours, and usually most of the day, to recover from a grand mal seizure.  Tr. 98.  She is groggy and wants to sleep all day.  Tr. 107.  Her petit mal seizures last only for a few seconds.  Tr. 98.  She has to stop what she is doing, but can return to her activity right away.  Tr. 98, 107-08.  With a petit mal seizure, it feels like her eyes go back and forth really fast.  Tr. 108.  She takes her medications at the time and in the amounts her doctors prescribe.  Tr. 102.

She suffered four seizures while working at her last job.  Tr. 103.  She was put on mandatory medical leave until she could take care of the problem and had the stimulator surgically implanted while out on leave.  *Id*.  The company shut down before her medical leave was completed.  *Id*.

She takes medication for her depression and PTSD and is engaged in counseling with Bauer one to two times per month.  Tr. 104-05.

### B.    Husband's Testimony

Orozco's husband testified that he has observed his wife experiencing seizures.  Tr. 111. With a grand mal seizure, Orozco has convulsions, falls down, and makes horrible sounds in her throat.  *Id*.  These last for about a minute or minute and a half.  *Id*.  He tries to make sure she is safe and away from sharp edges.  Tr. 112.  After the seizures, Orozco is "out almost for the rest of the day," is very tired, has a "big headache" and goes to sleep.  *Id*.  He thought stress might affect the frequency of her seizures.  Tr. 114.  He estimated Orozco suffered two seizures per month over the past five years.  Tr. 118-19.

### C.    Vocational Expert's Testimony

The ALJ asked the Vocational Expert ("VE") to consider a person who can lift up to 20 pounds occasionally and 10 pounds frequently; stand and walk for up to six hours and sit for up to six hours, frequently climb stairs and ramps, but should not climb ropes, ladders, or scaffolds; and can occasionally balance, and frequently stoop, kneel, crouch, and crawl.  Tr. 127.  The person should have no exposure to unprotected heights and moving or dangerous machinery, and be capable of unskilled, routine, repetitive tasks with simple instructions.  *Id*.  In addition, the person should have no more than occasional contact with the general public.  *Id*.  The VE testified that work at a garment sorter job would fall within the hypothetical.  Tr. 128.  The hypothetical person could miss one day of work a month, and exceed that occasionally, such as when sick with the flu, but should not exceed one day a month on a regular ongoing basis.  *Id*.

The ALJ then asked the VE to address the impact of having multiple days, three months out of 12, when the person would have to leave the work area to recover from a grand mal seizure. Tr. 128-29. The VE testified that the employer would wonder if the person was a danger to herself or others. Tr. 129-30. The problem was "more fundamental" than how many days were missed. Tr. 130. "If she's losing consciousness that many times then . . . most employers would be very concerned . . . to the point where if the behavior continued unabated, I think she would be let go." *Id*. Perhaps working at home would allow this, but not in "workplaces as they are generally understood." *Id*. If the employer tried to get hold of or talk to the person and she could not respond, then that is "pretty fundamental" and "extremely significant." Tr. 130-31. The VE further testified that Orozco's experience at her last job where she was put on a leave of absence after having four seizures was a typical reaction by an employer. Tr. 131.

## DISABILITY ANALYSIS

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 USC § 423(d)(1)(A). The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 CFR § § 404.1520, 416.920; *Tackett v. Apfel*, 180 F3d 1094, 1098-99 (9th Cir 1999).

At step one, the ALJ determines if the claimant is performing substantial gainful activity. If so, the claimant is not disabled. 20 CFR § § 404.1520(a)(4)(i) & (b), 416.920(a)(4)(i) & (b). At step two, the ALJ determines if the claimant has "a severe medically determinable physical or

mental impairment" that meets the 12-month durational requirement.  20 CFR §§ 404.1520(a)(4)(ii) & (c), 416.909, 416.920(a)(4)(ii) & (c).  Absent a severe impairment, the claimant is not disabled.  *Id*.

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations.  20 CFR § § 404.1520(a)(4)(iii) & (d), 416.920(a)(4)(iii) & (d); 20 CFR Pt. 404, Subpt. P, App. 1 (Listing of Impairments).  If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC").  The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments.  20 CFR § § 404.1520(e), 416.920(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work.  20 CFR § § 404.1520(a)(4)(iv) & (e), 416.920(a)(4)(iv) & (e).  If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the claimant can perform other work in the national economy.  *Bowen v. Yuckert*, 482 US 137, 142 (1987); *Tackett v. Apfel*, 180 F3d 1094, 1099 (9th Cir 1999); 20 CFR § § 404.1520(a)(4)(v) & (g), 416.920(a)(4)(v) & (g).

The initial burden of establishing disability rests upon the claimant.  *Tackett*, 180 F3d at 1098.  If the process reaches step five, the burden shifts to the Commissioner to show that jobs exist in the national economy within the claimant's RFC.  *Id*.  If the Commissioner meets this

burden, then the claimant is not disabled.  20 CFR § § 404.1520(a)(4)(v) & (g), 416.920(a)(4)(v) & (g), 416.960(c).

## ALJ'S FINDINGS

At step one, the ALJ concluded that Orozco has not engaged in substantial gainful activity since March 24, 2008, the date that the application was protectively filed.  Tr. 16.

At step two, the ALJ concluded that Orozco has the severe impairments of seizure disorder, cognitive disorder - NOS, major depressive disorder, and generalized anxiety disorder. *Id*.

At step three, the ALJ concluded that Orozco does not have an impairment or combination of impairments that meets or equals any of the listed impairments.  Tr. 17.  The ALJ found that Orozco has the RFC:

> to perform light work with lifting and carrying 20 pounds occasionally and 10 pounds frequently, standing and walking six hours of an eight hour workday and sitting six hours of an eight hour workday.  She can frequently climb ramps and stairs, stoop, kneel, crouch and crawl.  She can occasionally balance and never climb ladders, ropes and scaffolds.  The claimant cannot be exposed to unprotected heights or moving or dangerous machinery.  She is limited to unskilled work (routine, repetitive tasks with simple instructions) with occasional contact with the general public.

Tr. 19.

At step five, the ALJ found that considering Orozco's age, education, and RFC, she was capable of performing the past relevant work as a garment sorter.  Tr. 24.  Accordingly, the ALJ determined that Orozco was not disabled at any time through the date of the decision.

///

///

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on the proper legal standards and the findings are supported by substantial evidence in the record.  42 USC § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004).  The court must weigh the evidence that supports and detracts from the ALJ's conclusion.  *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998).  However, the reviewing court may not substitute its judgment for that of the Commissioner.  *Id*, citing *Robbins v. Soc. Sec. Admin.*, 466 F3d 880, 882 (9th Cir 2006); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001).  Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a rational reading. *Lingenfelter*, 504 F3d at 1035; *Batson*, 359 F3d at 1193.

## DISCUSSION

Orozco argues that the ALJ erred in four respects:  (1) failing to give clear and convincing reasons for rejecting her testimony; (2) failing to credit the opinion of Dr. Piercey, her treating neurologist; (3) failing to address the opinion of Bauer, her treating therapist; and (4) finding that she retains the ability to perform her past work.

## I.    **Orozco's Credibility**

The ALJ concluded that Orozco's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible."  Tr. 21.  Orozco challenges this conclusion as not based on clear and convincing reasons.

///

///

A.    **Legal Standard**

The ALJ must consider all symptoms and pain which "can be reasonably accepted as consistent with the objective medical evidence and other evidence."  20 CFR §§ 404.1529(a), 416.929(a).  Once a claimant shows an underlying impairment which may "reasonably be expected to produce pain or other symptoms alleged," absent affirmative evidence of malingering, the ALJ must provide "clear and convincing" reasons for finding a claimant not credible.  *Lingenfelter*, 504 F3d at 1036, citing *Smolen v. Chater*, 80 F3d 1273, 1281 (9th Cir 1996).  The ALJ's credibility findings must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony."  *Orteza v. Shalala*, 50 F3d 748, 750 (9th Cir 1995), citing *Bunnell v. Sullivan*, 947 F2d 341, 345-46 (9th Cir 1991) (*en banc*).  A general assertion that the plaintiff is not credible is insufficient; the ALJ "must state which [subjective symptom] testimony is not credible and what evidence suggests the complaints are not credible."  *Dodrill v. Shalala*, 12 F3d 915, 918 (9th Cir 1993).  The ALJ may additionally employ ordinary techniques of credibility evaluation, such as weighing inconsistent statements regarding symptoms by the claimant.  *Id*.

Examples of clear and convincing reasons include conflicting medical evidence, effective medical treatment, medical noncompliance, inconsistent statements, daily activities inconsistent with the alleged symptoms, a sparse work history, or testimony that is vague or less than candid. *Tommasetti v. Astrue*, 533 F3d 1035, 1040 (9th Cir 2008).  Inconsistencies in a claimant's testimony, including those between the medical evidence and the alleged symptoms, can serve as a clear and convincing reason for discrediting such testimony.  *Burch v. Barnhart*, 400 F3d 676, 680 (9th Cir 2005); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F3d 595, 599 (9th Cir 1999).

Failure to seek medical treatment is also a clear and convincing reason to reject a claimant's

subjective statements.  *Burch*, 400 F3d at 681; *Fair v. Bowen*, 885 F2d 597, 603-04 (9th Cir

1989); *see also* SSR 96-7p, 1996 WL 374186 (July 2, 1996).

      Credibility determinations are within the province of the ALJ.  *Fair*, 885 F2d at 604,

citing *Russell v. Bowen*, 856 F2d 81, 83 (9th Cir 1988).  Where the ALJ has made specific

findings justifying a decision to disbelieve an allegation of excess pain, and those findings are

supported by substantial evidence in the record, the role of the reviewing court is not to second-

guess that decision.  *Id*.

### B.    __ALJ's Reasons__

      Given the absence of evidence of malingering, the ALJ was required to provide clear and

convincing reasons to reject Orozco's testimony.  The ALJ first stated that Orozco exaggerated

the severity of her seizures when reporting to Dr. Wagener, the examining psychologist, in

February 2010 that she had nine seizures in October 2009, when in fact she only had seven.

Tr. 21.  Although Orozco admits this inconsistency, it is not a clear and convincing reason to

discredit her testimony.  The discrepancy between reporting seven or nine seizures is not

significant.  This is especially true in light of the ALJ's own findings that Orozco suffers from a

cognitive disorder and other mental conditions related to her epilepsy that cause her to have at

least moderate limitations in concentration, persistence, and pace.  Tr. 16, 19.  Moreover, as

Dr. Wagener found, Orozco's ability to sustain concentration, maintain attention, and to persist

at tasks would be "significantly impaired" by her depressive symptoms.  Tr. 560.

      The ALJ also took issue with Orozco's report to Dr. Wagener that she had "scarring on

her brain from seizures, and yet a brain MRI showed no abnormalities."  Tr. 21, 557.  Although

the brain MRI was normal, the record is replete with references to abnormal EEGs.  Tr. 374, 402-03, 690.  Moreover, Dr. Piercey stated Orozco has cognitive dysfunction from epilepsy which Dr. Wagener confirmed with testing.  Tr. 560, 614, 616, 632, 634, 636.  While "scarring" is not necessarily the accurate or correct medical term, it does convey that Orozco suffers from cognitive dysfunction from her epilepsy condition, which is accurate.  Accordingly, this is not a clear and convincing reason to reject Orozco's credibility.

Next, the ALJ stated that there were "several instances" when Orozco failed to "refill medications leading to increased seizure activity."  Tr. 21.  Dr. Piercey did state that Orozco had a seizure in December 2009 because she ran out of Neurontin and had seizures in June and July 2011 when she ran out of Vimpat for a couple months.  Tr. 609, 694.  Evidence in the record, however, indicates that Orozco did not re-fill prescriptions due, at least in part, to an inability to afford the cost after losing insurance coverage when her husband became unemployed.  *Id*.

If a claimant complains about a disabling symptom, but fails to seek or follow prescribed treatment, an ALJ may use such failure as a basis for finding the complaint unjustified or exaggerated.  *Orn v. Astrue*, 495 F3d 625, 638 (9th Cir 2007).  Claimants who cannot afford necessary medication or treatment, however, cannot be denied benefits on the basis that they have not undergone such treatment.  *See, e.g., Gamble v. Chater*, 68 F3d 319, 321 (9th Cir 1995) (holding that "[d]isability benefits may not be denied because of the claimant's failure to obtain treatment he cannot obtain for lack of funds").

Moreover, over the course of the relevant period, Orozco was largely compliant and suffered seizures even while compliant.  Accordingly, Orozco's non-compliance with treatment plans is not a clear and convincing reason to reject her credibility.

Next, the ALJ stated Orozco took "college classes for over a year . . . suggesting an ability to sustain work activity." Tr. 21. Orozco did not, however, demonstrate a consistent ability to earn A's and B's in her college classes on which the ALJ relied to find that "any cognitive limitation would have to be minimal." Tr. 23. The community college records show Orozco was able to earn A's and B's in the Fall 2008 term, but her grade point dropped from 3.71 to 2.78 in the Winter 2009 term. Tr. 351. In the Spring 2009 term, she earned a B in one class and a D in another and withdrew from three other classes. *Id*. Finally, in the Fall 2009 term, Orozco withdrew from all classes after suffering seven seizures in October. Tr. 352.[4] This record demonstrates a declining ability to sustain work activity.

Finally, the ALJ stated that Orozco did not seek treatment other than psychotropic medications for her cognitive impairments, "suggesting that the medications were largely successful." Tr. 23. That is not accurate. In addition to seeking medication, Orozco actively sought therapy treatment with Dr. Fusek and Bauer. Tr. 595-96, 655-60, 696-705.

In sum, the ALJ erred by failing to give clear and convincing reasons for rejecting Orozco's testimony.

## II.    Dr. Piercey's Opinion

Orozco also challenges the ALJ's rejection of Dr. Piercey's August 2011 opinion. After following Orozco for more than five years and participating in her care, Dr. Piercey stated that Orozco was experiencing more than one grand mal seizure per month, and on average, two.

---

[4] The ALJ notes Orozco's withdrawal from classes was reportedly due to child care issues, relying upon a statement Orozco made to PA Rundall a year later on November 7, 2011. Tr. 23, 723. While PA Rundall noted such a reference from Orozco in the records, it is apparent from the medical records pertaining to the Fall 2009 term that Orozco's seizure condition prevented her from regularly attending classes.

Tr. 689.  Dr. Piercey opined that employment was "not a reasonable consideration."  *Id*.  The ALJ gave "little weight" to that opinion because that the record did not support the frequency of seizures reported by Dr. Piercey.  Tr. 18.

The weight given to the opinion of a physician depends on whether it is from a treating physician, an examining physician, or a non-examining physician.  More weight is given to the opinion of a treating physician who has a greater opportunity to know and observe the patient as an individual.  *Orn*, 495 F3d at 632 (citations omitted).  If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons.  *Id*.  Even if the opinion is contradicted by another physician, the ALJ may not reject it without providing specific and legitimate reasons supported by substantial evidence in the record.  *Id*.  The opinion of a non-examining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician.  *Widmark v. Barnhart*, 454 F3d 1063, 1067 n2 (9th Cir 2006).  However, it may serve as substantial evidence when it is supported by and consistent with other evidence in the record.  *Morgan*, 169 F3d at 600 (citation omitted).

To discredit Dr. Piercey, the ALJ tallied the seizures noted in the record and determined that Orozco had 29 seizures since March 2008 which "averages to less than one seizure every two months" and contradicted Dr. Piercey's calculations.  Tr. 18.  However, Dr. Piercey did not indicate in her August 2011 opinion over what period she was averaging Orozco's seizures.  Tr. 689.  At that time, Orozco had suffered two seizures in July and two in June.  Tr. 694.  This court also questions the legitimacy of averaging the number of seizures as a basis for finding them insignificant.  The record reflects that the number and types of Orozco's seizures is

unpredictable, at best, and has already cost Orozco at least one job. Therefore, the ALJ's rejection of Dr. Piercey's calculation is not reasonable.

Dr. Piercey also opined that from a neurocognitive standpoint, assimilating the information that a new job would entail may be problematic. Tr. 689. The ALJ noted that Dr. Piercey concluded Orozco "has some level of cognitive dysfunction from epilepsy and Dr. Wagener diagnosed a cognitive disorder." Tr. 23. However, she found that "no such diagnosis appears in the [LCMH] records or in the records of briefly treating psychologist Dr. Fusek." *Id*. Even without such a diagnosis by LCMH or Dr. Fusek, the record nonetheless reveals that Orozco suffered a significant cognitive impairment. As Dr. Wagener wrote, Orozco's "ability to sustain concentration and maintain attention and to persist at tasks would be significantly impaired by depressive symptoms. Tr. 560. The ALJ found "equally interesting" that Orozco "was enrolled in college at approximately the same time she was diagnosed with cognitive dysfunction, yet her college transcripts indicated mostly A's and B's in the courses from which she did not withdraw." *Id*. As discussed above, the ALJ ignored the subsequent decline in Orozco's ability to continue her education.

Thus, the ALJ failed to give specific and legitimate reasons supported by substantial evidence to reject Dr. Piercey's opinion.

### III.    Therapist Bauer's Opinion

Orozco also argues that the ALJ erred by failing to address the opinion of her treating therapist, Bauer. Bauer wrote that Orozco's symptoms posed a challenge to effectively functioning in an employment setting, interacting with the public, and handling conflict or criticism. Tr. 697. Although she appeared capable of performing moderately detailed tasks and

instructions, he opined she was unable to effectively handle anything close to full-time employment eight hours a day, five days a week.  *Id.*

Although not considered to be acceptable medical sources, therapists and nurse practitioners are considered to be "other sources."  20 CFR § 404.1513(d); 20 CFR § 416.913(d). The ALJ must consider "other source" testimony and provide "germane reasons" to reject it. *Molina v. Astrue*, 674 F3d 1104, 1114 (9th Cir 2012).  Germane reasons for discrediting testimony include inconsistency with the medical evidence and testimony that "generally repeat[s]" the properly discredited testimony of a claimant.  *Bayliss v. Barnhart*, 427 F3d 1211, 1218 (9th Cir 2005).

The ALJ did not specifically mention Bauer's treatment of Orozco in his opinion and, therefore, failed to provide any reason to reject it.  He did, however, reference the GAF score assigned by Bauer for LCMH ("in the 30s") as inconsistent with Dr. Fusek's GAF score (60). Tr. 23.  Noting that there was "nothing to explain the substantial difference in terms of some intervening event," the ALJ gave more weight to Dr. Fusek "given her credentials and the more benign findings in the report by Dr. Wagener."  Tr. 23.  The ALJ also noted that Bauer's assessment of Orozco was "based merely on the claimant's self-report rather than observations made over the course of a developing treating relationship."  *Id*.  The ALJ's reasons for favoring the opinions of Dr. Fusek and Dr. Wagoner are not germane.  First, Bauer treated Orozco as many times as Dr. Fusek and over a longer period of time.  Dr. Fusek saw Orozco for three therapy sessions in March and April 2010.  Tr. 595-604.  Orozco continued her therapy with Bauer, seeing him first in December 2010 and then twice in January 2012.  Tr. 658-59, 697-99. Dr. Wagener only examined Orozco once.  Tr. 557.  Second, reliance on Orozco's self-reporting

was not a germane reason, after the ALJ improperly discredited Orozco's testimony. Moreover, Bauer's assessment did not rely entirely upon Orozco's self-reporting. For instance, in January of 2012, he noted that Orozco appeared restless, hyperactive and fidgety, agitated, and intense. Tr. 700.

Finally, Dr. Fusek's assessment suggests that Orozco's mental state would deteriorate without weekly, long-term treatment. Tr. 604. After her last session with Dr. Fusek in April 2010, Orozco received no mental health therapy (likely because she did not have insurance) until December 2010. Even so, several incidents occurring between her last session with Dr. Fusek and treatment with Bauer could have explained the difference in GAF score. In October 2010, Orozco visited the emergency room for anxiety and suffered a panic attack. Tr. 661, 671. Once she was on the Oregon Health Plan, she visited PA Randall for reference to mental health services. Tr. 671.

Thus, the ALJ erred by failing to provide a germane reason to reject Bauer's opinion.

## IV.    Ability to Perform Past Relevant Work

Finally, Orozco challenges the ALJ's finding that she retains the ability to perform her past work as a garment sorter as contrary to the VE testimony and the weight of the evidence.

An ALJ's hypothetical to a VE must set out all of the claimant's impairments and limitations. *Andrews v. Shalala*, 53 F3d 1035, 1043 (9th Cir 1995); *see also Gallant v. Heckler*, 753 F2d 1450, 1456 (9th Cir 1984). The hypothetical posed to the VE, however, only has to include those limitations supported by substantial evidence in the record. *Robbins*, 466 F3d at 886 (citation omitted). If the assumptions in the hypothetical are not supported by the record, a

VE's opinion that a claimant can work does not have evidentiary value.  *Gallant*, 753 F3d at 1456.

The hypothetical posed by the ALJ to the VE asked whether a person would be employable who, on multiple days during three months out of 12, would have to leave the work site to recover from a grand mal seizure.  Tr. 128-29.  Instead of directly answering that question. the VE testified that the problem was "more fundamental" than how many days the person would miss work because no employer would retain an employee who suffered multiple occurrences of convulsions and loss of consciousness in the workplace.  Tr. 130.

The ALJ concluded that such intolerance on the part of an employer would be discrimination, stating that "the fact that an employer may discriminate against persons with seizure disorders is not a relevant consideration."  Tr. 22.  Orozco argues the ALJ should not have based his determination of the availability of jobs on the assumption that the Americans with Disabilities Act ("ADA") requires an employer to accommodate an individual's disability. The Commissioner counters that the ALJ made no such assumption, but merely noted that an employer's discrimination is irrelevant to the disability determination.  The court agrees and finds it unnecessary to address the cases cited by Orozco.

Still, the ALJ erred by finding Orozco could perform her past work despite her regular and unpredictable absenteeism.  On this point the VE was clear.  Under the industry standard for absenteeism, a person is unemployable if she misses work one day or more a month on a regular, ongoing basis.  Tr. 128.  According to Dr. Piercey, Orozco experiences more than one grand mal seizure and several partial seizures per month from her permanent refractory epilepsy.  Tr. 689. Given the number of days Orozco would likely be absent from work on a regular basis, the ALJ

lacked sufficient evidence to determine that Orozco could perform the past relevant work of garment sorter.  This is true whether under the hypothetical posed by the ALJ or another hypothetical incorporating the evidence from Orozco and Dr. Piercey which the ALJ incorrectly failed to credit.

Thus, the ALJ erred in finding Orozco could still perform her past relevant work as a garment sorter.

## REMAND

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court.  *Harman v. Apfel*, 211 F3d 1172, 1178 (9th Cir 2000).  The issue turns on the utility of further proceedings.  A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision.  *Strauss v. Comm'r of Soc. Sec. Admin.*, 635 F3d 1135, 1138 (9th Cir 2011).  The court may not award benefits punitively and must conduct a "credit-as-true" analysis to determine if a claimant is disabled under the Act.  *Id*.

Under the "crediting as true" doctrine, evidence should be credited and an immediate award of benefits directed where "(1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited."  *Id*, quoting *Benecke v. Barnhart*, 379 F3d 587, 590 (9th Cir 2004).  The "crediting as true" doctrine is not a mandatory rule in the Ninth Circuit, but leaves the court flexibility in determining whether to enter an award

of benefits upon reversing the Commissioner's decision.  *Connett v. Barnhart*, 340 F3d 871, 876 (9th Cir 2003).  The reviewing court declines to credit testimony when "an outstanding issue" remains.  *Luna*, 623 F3d at 1035.

As discussed above, the ALJ erred in several respects.  If the testimony of Orozco and her husband is credited, as well as the opinions of Dr. Piercey and therapist Bauer, substantial evidence in the record supports the conclusion that Orozco cannot perform her past relevant work and, indeed, can perform no work due to her conditions.  Orozco's limitations due to her refractory epilepsy are permanent (Tr. 517), and she continues to have seizures despite aggressive medication trials and an implanted vagal nerve stimulator.  Tr. 689.  Thus, it is clear that the ALJ would be required to find Orozco disabled if that evidence is credited.

## ORDER

For the reasons discussed above, the Commissioner's decision that Orozco is not disabled is REVERSED AND REMANDED pursuant to Sentence Four of 42 USC § 405(g) for an award of benefits.

DATED this 18th day of July, 2014.

s/ Janice M. Stewart_____

Janice M. Stewart
United States Magistrate Judge

29 - OPINION AND ORDER